IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  08-cv-00855-LTB-KMT

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF LA PLATA, COLORADO,

        Plaintiff,

v.

BROWN GROUP RETAIL, INC.,
PLUMMER PRECISION OPTICS CO.,
BLUE JAUNTE COMPANY, INC., and
PLUMMER PRECISION OPTICS WESTERN DIVISION, INC.,

        Defendants.

---

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

---

Babcock, J.

Trial to the Court in this environmental contamination case was held from October 4 through October 22, 2010. Based upon the parties' stipulations and written submissions, the evidence presented at trial, and the deposition testimony designated by the parties, I make the following findings of fact and conclusions of law:

## I.  Findings of Fact

I find the following facts based upon a preponderance of the evidence:

## A.  The Parties

1. La Plata County ("La Plata") is a County of the State of Colorado, a political subdivision of the State.

2.  Defendant Brown Group Retail, Inc. ("Brown Group") is a Pennsylvania corporation

authorized to do business in the State of Colorado.  Through a series of corporate transactions,

Brown Group is the successor in interest to and/or the same company via a name change as

Brown Group Recreational Products, Inc.  Brown Group is also a successor in interest to a

company known as Outdoor Sports Industries, Inc. ("OSI").

3.  Defendant Blue Jaunte Company, Inc. ("Blue Jaunte") is a Pennsylvania corporation

with a registered office of 220 W. Gay Street, West Chester, PA 19380.  Blue Jaunte was

formerly known as and is the successor in interest to Defendant Plummer Precision Optics

("PPO") and Defendant Plummer Precision Optics Western Division, Inc. ("Plummer Western").

Defendant Plummer Western was a wholly owned subsidiary of Defendant PPO.  Blue Juante,

PPO, and Plummer Western are collectively referred to herein as "the Plummer Defendants" or

"Plummer."

4.  On April 17, 2009, I entered default judgment against each of the Plummer

Defendants when they failed to plead or otherwise defend after being properly served.  *See* Doc.

No. 92.  By its terms, this default judgment is subject to a final decree consistent with a final

adjudication of the claims against Brown Group, the remaining defendant in this case.  The

Plummer Defendants are separate entities from Brown Group and likely have no assets with

which to satisfy any monetary judgment entered against them.

**B.  General Background**

5.  This case concerns the contamination of property located at 742 Turner Drive in

Durango, Colorado ("the Property").  The Property was formerly the site of a rifle lens

manufacturing plant (the "Plant") and is now the site of the La Plata County Detention Center

("the Jail").

6.  The Property sits on an upper hillside of the Bodo Industrial Park.  Just down the hill from the Property are additional businesses along Suttle Street that are also located in the Bodo Industrial Park.

7.  All property within the Bodo Industrial Park is, and has always been, zoned for industrial and commercial use.  For some uses, the applicable covenants permit a custodial dwelling to be located on the property.  However, no such dwellings have ever been built.  The buildings in the Bodo Industrial Park are, and have always been, connected to City of Durango water and sewer services.

8.  In 1975, OSI acquired the Property as vacant land and built the Plant on it.  For purposes of simplicity, "Brown Group" is hereinafter also used to refer to OSI and its corporate successors.

9.  From 1975-76 to 1979, Brown Group operated the Plant to produce optical lenses incorporated into rifle scopes and to assemble rifle scopes.

10.  In September of 1979, Brown Group leased at least a portion of the Property and the Plant to Plummer.  Brown Group also sold a substantial portion of its lens manufacturing equipment, material, and inventory to Plummer.

11.  From 1979 to 1982, Plummer continued to operate the Plant using the same or similar processes as Brown Group.  A number of Brown Group employees were also Plummer employees.  Brown Group remained owner of the Property and the Plant and purchased lenses from Plummer throughout Plummer's tenancy.

12.  Plummer closed the Plant in 1982.  After Plummer exited the premises, Brown Group prepared the Property for sale and put it on the market.

**C. Operations at the Plant**

13. Trichloroethylene/trichloroethene ("TCE"); 1,1,1-trichloroethane ("TCA"); and 1,4 dioxane (collectively the "Solvents") were used in the lens manufacturing process at the Plant and disposed of in unknown quantities by both Brown Group and Plummer.

14. The Solvents were used in one or more vapor degreasers that cleaned the lenses produced at the Plant. The vapor degreasers are generally described as metal containers several feet wide by several feet long and several feet high containing heated liquid Solvent and vapors. Trays of lenses were either lowered into the liquid Solvent or the layer of vapor above it or were sprayed with Solvent via a hose and sprayer attachment over the degreaser.

15. At times, Solvents dripped onto the Plant's concrete floors from the lenses that had been cleaned in the vapor degreaser. Most of these drips evaporated quickly. Some, however, were washed into floor length trench drains along with other substances when the floors were cleaned at the end of a shift. Plant employees also occasionally dumped water used to clean the floors, including drips of Solvent, down sinks at the Plant. From the Plant's trench drains and sinks, Solvents and other substances entered the plumbing underneath the Plant.

16. Drums of new and waste Solvents were stored on a loading dock located on the east side of the Plant. There is insufficient evidence to support a finding that Solvents in any significant amount spilled or leaked from these drums or that spills or leaks from these drums caused contamination at the Property or offsite.

17. Rags used to wipe up Solvent drips and spills were disposed of in a dumpster located outside the Plant near the loading dock on the east side of the Plant. There is insufficient evidence to support a finding that Solvents spilled or leaked from this dumpster or that any spills

-4-

or leaks from this dumpster caused contamination at the Property or offsite.

18. Stella Silva, a former Plant employee, testified that she and other employees dumped pans of unknown substances on the ground on the east side of the Plant to the north of the loading dock. There is insufficient evidence to support a finding that the pans being dumped contained Solvents. Instead, based on the duties Ms. Silva performed at the Plant, it is likely that the pans being dumped contained acetone. Acetone is not a chemical of concern in this case.

19. Perry Barnes, another former Plant employee, testified that on two or three occasions he mixed a liquid that was the same black color as that contained in the vapor degreaser with another substance that he was told would neutralize the liquid and produce salt water. Mr Barnes testified that combining the two substances produced heat and 4-6 inches of foam that was light brown in color. Mr. Barnes testified that he dumped the mixture on the ground to the east of the loading dock on the west side of a berm located near the eastern boundary of the Property. According to Mr. Barnes, the dumped mixture traveled south less than 50 feet and was absorbed into the soil.

20. The weight of expert testimony on this issue indicates that the mixture dumped by Mr. Barnes contained, at most, low concentrations of Solvents. Specifically, the foaming reaction described by Mr. Barnes would not result from adding a neutralizing substance to Solvents nor would this process produce salt water. Instead, Mr. Barnes description is more consistent with neutralizing a predominantly water based solution with acid. In addition, the soil gas readings in the area where Mr. Barnes dumped the mixed substance do not show the significant levels of Solvents that would be expected if Mr. Barnes was neutralizing essentially pure Solvent. The dumping described by Mr. Barnes therefore did not contribute to Solvent

contamination at the Property or offsite.

**D.  State of Practice/Standard of Care During the Plant's Operations**

21.  During the time the Plant was in operation, Solvents were commonly used  in

manufacturing operations and were a common ingredient in cleaning products.  During this time,

there was a growing awareness that TCA and TCE were potentially dangerous chemicals though

there was little regulation relating to the handling and disposal of these Solvents.

22.  Plant employees received little to no training on the dangers of Solvents or

appropriate methods for handling and disposing of them.  Nonetheless, there is insufficient

evidence to support a finding that Brown Group's management and handling of Solvents during

the applicable time period did not meet the standards of care in the industry that existed at that

time in the State of Colorado.

**E.  La Plata's Purchase of the Property**

23.  On December 20, 1982, La Plata entered into a contract to buy the Property from

Brown Group for $650,000.

24.  Prior to entering into the sale contract, representatives of La Plata including former

County Commissioner Sara Duncan and former County Attorney David Dickinson toured the

Plant after Plummer had ceased manufacturing operations.  Ms. Duncan and Mr. Dickinson did

not recall observing any evidence of possible chemical contamination at the Property but

acknowledged that they were not actively looking for such evidence and had no experience or

expertise at that time with environmental concerns relating to real estate transactions.

25. Ms. Duncan and Mr. Dickinson were generally aware that rifle scopes were

manufactured at the Plant but had no knowledge about the specifics of the manufacturing process

including the use of Solvents during this process.  No inquiry was made into the specifics of
manufacturing operations at the Plant prior to La Plata's purchase of the Property.

26.  The level and nature of inquiry that La Plata made prior to purchasing the Property
were consistent with prevailing commercial real estate standards and practices in Durango,
Colorado at the time of the purchase.

27.  La Plata took title to the Property by deed dated March 22, 1983.

**F. La Plata's Conversion of the Plant to the Jail**

28.  La Plata purchased the Property with the intent of converting the Plant into a new
county jail.  La Plata began construction activities for this purpose sometime after the sale
closed.  The Durrant Group served as the Design/Build Contractor for the conversion project.

29.  In 1985, La Plata began work for the construction of a "sally port" on the east side of
the existing Plant building.  The sally port would be used to securely transport prisoners, goods,
and equipment into the Jail.  The newly constructed sally port would encompass and expand on
the location of the Plant's former loading dock.

30.  One of the initial steps in constructing the sally port was to dig trenches to the south
of the former loading dock for the placement of footers to support the sally port structure.  This
work was performed in August or September of 1985 by Melco, Inc., a subcontractor to J.C.
Construction owned by Jerry Lucas.

31.  Mr. Lucas used a rubber-tired backhoe with a bucket to dig the trenches where the
footers for the sally port structure would be placed.  While excavating the trenches, Mr. Lucas
unexpectedly struck a large, hard object with the backhoe.  Mr. Lucas used the backhoe to dig
around the sides and to scrape dirt off the top of the object until he was able to determine that the

object was a concrete vault several feet wide by several feet long.

32. La Plata and Brown Group presented differing opinions about the location of the concrete vault. While both parties place the vault to the south of the Plant's former loading dock, Brown Group asserts that its location was 5-10 feet further east than the location relied upon by La Plata. Based on attendant plumbing issues, I find that the location identified by Brown Group is more plausible. Specifically, the location identified by La Plata would require that the vault's outlet pipe either go through the foundation wall of the former loading dock or make a quick sharp turn to get around the foundation wall. Witnesses at a 2010 investigatory excavation did not observe any holes in the foundation wall of the loading dock, and the turning of pipes that would otherwise be necessary to support La Plata's placement of the sediment tank would be inconsistent with standard plumbing practices.

33. Mr. Lucas alerted the on-site supervisor about the presence of the vault, a portion of which was located where a sally port footer was to be placed. Further excavation was halted at that time so that a decision could be made about what to do with the vault, and Mr. Lucas left the Property for the day.

34. Ken Shubert, a plumber and former Plant employee, was called to the Property to examine the concrete vault discovered by Mr. Lucas. Mr. Shubert determined that the vault was a sediment tank designed to separate particulate matter out of water and that it was no longer in use. The tank was five-six feet long by four feet wide and four-five feet deep and was located approximately 24 inches below the ground surface.

35. Mr. Shubert examined the interior of the tank by looking through one of two access ports or manhole covers on the lid of the tank and using a flashlight or mirror to illuminate the

interior.  Mr. Shubert observed a dark liquid that appeared to be water.  Using a five-foot long pick bar to reach to the bottom of the tank, Mr. Shubert determined that the depth of the liquid was 2-3 inches with 16-18 inches of solid material that had the consistency of sand or silt beneath it.  Mr. Shubert also jumped down into the tank.  Mr. Shubert did not observe any leaks in the tank or smell the strong chemical smell that he recalled from working at the Plant.

36.   The tank had a four-inch outlet pipe that extended 10-15 feet.  The outlet pipe first traveled a few feet to the northeast before turning and traveling north.  The soil around this pipe was damp leading Mr. Shubert to conclude that it was leaking.  Mr. Shubert replaced several feet of the pipe.  Mr. Shubert left the Property before any further action was taken with respect to the sediment tank.

37.   After considering other options, La Plata and/or its contractors decided to demolish the sediment tank in place and have the debris hauled away.  Mr. Lucas returned to the Property the next day to perform this task.  Using the same backhoe, Mr. Lucas testified that he first crushed the lid of the tank with the bucket of the backhoe causing the pieces to fall into the tank. Mr. Lucas testified that he then crushed the sides and bottom of the tank into pieces that were removed with the bucket and loaded directly into a dump truck.

38.   Mr. Lucas testified that there was no liquid in the tank at the time he demolished it though he had observed some liquid in the tank when it was discovered the previous day.   Mr. Lucas further testified that there was only a thin layer of scum on the bottom of the tank at the time he demolished it.  There is no evidence, however, that the tank was emptied or pumped out prior to its demolition, and Mr. Shubert's testimony based on his firsthand observations and testing with the pick bar support a finding that the tank contained approximately 2 -3 inches of

liquid and 16-18 inches of solid silt-like material at the time it was demolished.

39.  La Plata and its contractors did not test the contents of the sediment tank or consult with any environmental specialist regarding the tank's contents or the disposal of them.

40.  Based on the previous finding that Solvents entered the plumbing underneath the Plant after being washed into the Plant's floor trenches and/or being dumped down the Plant's sinks, I further find that Solvents were present in the sediment tank at the time it was discovered by La Plata.  The Solvents in the sediment tank were released into the environment when the tank was demolished by Mr. Lucas.

41.  Mr. Lucas testified that he placed all soil that he excavated on the Property outside the Plant building, including that removed from on top of and around the sediment tank, directly into a dump truck and then hauled it off the Property.  Mr. Lucas testified he did not "stage" the soil, *i.e.* place it on the ground near where he was excavating, on this job as he has done on other jobs because he did not need the excavated soil for backfill since the excavated area was to be filled in with gravel.

42.  Mr. Lucas's testimony regarding his handling of excavated soils is inconsistent with that of several other witnesses including Mr. Shubert who observed excavated soil on the ground near the sediment tank when he went to inspect the tank for La Plata and other witnesses who observed no gravel during a 2010 investigatory excavation in the area where the sediment tank was located.  Additionally, William McConnell, a Brown Group expert regarding general construction practices, testified that based on the type of backhoe used by Mr. Lucas, the typical practice would have been to stage the excavated soils because it would be more efficient and cost effective to do so.  I therefore find that the weight of the evidence supports a finding that Mr.

Lucas staged some of the soils that he excavated on the Property outside the Plant building and that some of these soils were used for backfill after the sally port footers were placed.

43.   During La Plata's conversion of the Plant to the Jail, Mr. Lucas also saw-cut through the concrete floors of the Plant and dug trenches underneath for purposes of installing new utilities and walls.  Mr. Lucas recalls smelling Solvents in the soils dug up during this process. The removed concrete was loaded into a dump truck and removed from the Property.  Some of the soils that were dug up were used as backfill in the trenches from which they were removed, and the remaining soils were loaded into a dump truck and removed from the Property.  There is no evidence that Mr. Lucas's work inside the Plant building spread Solvent contamination at the Property or offsite.

**G. La Plata's Operations/Activities at the Property and the Jail**

44.   The weight of the evidence demonstrates that La Plata did not use or purchase products containing significant amounts of Solvents.

45.   La Plata plans to do a fourth and fifth phase of construction at the Property in the next 5-10 years that will require soil excavation to a depth of 8-10 feet.

46.   Groundwater on the Property is not presently being used for drinking water or any other purpose.

47.   In May of 2010, La Plata, with Brown Group representatives present, conducted an investigatory excavation in the area where the sediment tank was at that time still be believed to be located.  The investigation did not reveal any remaining concrete from the sediment tank, any gravel used as backfill, or any of the silt-like contents of the sediment tank though the dark color of these contents would make them difficult to discern in the excavated soil.

**H.  Early Discovery of Contamination and Notice to Brown Group**

48.  In 2003, publicity about contamination at a former Brown Group rifle lens manufacturing plant in Denver prompted La Plata to investigate possible contamination at the Property.  La Plata retained Plateau Environmental Services ("Plateau") to conduct the investigation.

49.  Plateau obtained samples in 2003 that detected the presence of Solvents in the Property's groundwater and soil.  The level of Solvents detected in the groundwater samples exceeded Colorado state standards.  Plateau also obtained samples of the indoor air at the Jail in 2003 that detected the presence of TCE but at levels below Colorado state residential standards.

50.  From 2004 through 2007, La Plata, through Plateau continued investigating contamination relating to the Property.

51.  By letter dated September 20, 2007, La Plata  notified Brown Group and the Plummer Defendants that Solvents had been detected in soil and groundwater on the Property and in groundwater offsite, and that it intended to file suit under the Resource, Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a).

52.  In January of 2008, La Plata retained Environmental Management Support, Inc. ("EMSI") to review its investigation of the contamination to date, conduct any further investigation that was necessary, propose a remediation plan, and provide litigation support.

53.  La Plata filed suit against Brown Group and the Plummer Defendants on April 25, 2008, asserting claims under RCRA, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and state common law.

## I.  Nature and Extent of Contamination

54.  Solvents have been detected in soil, soil gas, groundwater, and indoor air at the Property.  Solvents have also been detected in offsite groundwater and indoor air.  There has been no sampling of offsite soil or soil gas.

55.  Based on the relative concentrations of the various Solvents, the contamination on the Property and offsite can loosely be divided into three general areas (1) the area underneath and to the west of the Jail where there are high levels of TCA relative to TCE; (2) the area to the east of the Jail and continuing to the Property boundary where there are high levels of TCE and 1,4 dioxane relative to TCA; and (3) the area further east of the Jail that is offsite where there are high levels of TCA relative to TCE.

56.  The levels of TCE detected in some soil samples from the Property exceed the Colorado Soil Evaluation Values ("CSEVs").  The highest level of TCE in soil on the Property was found to the east of the former loading dock on the east side of the Plant near the former location of the sediment tank and the north-south municipal sewer line.

57.  The levels of TCA and 1,4 dioxane detected in soil on the Property do not exceed the CSEVs.

58.  Only very limited soil sampling has been taken from underneath the Jail due to inaccessibility.  Nonetheless, based on soil gas sample results, TCE and TCA are likely present in soil underneath the Jail.

59.  Soil gas samples are used as a screening mechanism to detect hot spots, or where one might expect to find the highest levels of a contaminant.  Soil gas samples on the Property reflect that the highest levels of TCA can be found under the Jail while the highest levels of TCE can be

found just east of the Jail.

60.    Solvents have been detected in groundwater from the west of the Jail to offsite properties to the west of Suttle Drive.  The levels of TCE and 1,4 dioxane in groundwater on the Property and offsite exceed applicable governmental standards.  The levels of TCA in the groundwater offsite also exceed applicable governmental standards.

61.    The Solvent contamination in the groundwater under the Property and offsite form a plume that is stable, *i.e.* that is not increasing in size, which indicates that there is an ongoing source or sources of groundwater contamination because otherwise the size of the plume would be decreasing as a result of natural attentuation.

62.    Indoor air samples were obtained at the Jail in 2003, 2006, 2008, and 2009.  No 1,4 dioxane was detected in these samples.  TCA has been detected in a few of the indoor air samples from the Jail but at levels below the residential and commercial screening levels.  Accordingly, the only Solvent that is of any concern with respect to the indoor air at the Jail is TCE.

63.    No TCE was detected in indoor air samples taken at the Jail in 2006 or 2009.  In 2003, two indoor air samples from the Jail detected TCE at levels below the residential and commercial screening levels for indoor air though one sample was in the range that would require monitoring.  In 2008, one indoor air sample from the Jail detected TCE at a level of 2.9 mirograms per cubic meter, which is below the commercial screening level for indoor air but above the residential screening level.

64.    TCA has been detected in offsite indoor air samples but at levels below residential and commercial screening levels.  No TCE or 1,4 dioxane was detected in offsite indoor air

samples.

**J.  Likely Sources of Contamination**

65.  The contamination that is found on the Property underneath and to the west of the Jail was caused solely by manufacturing operations at the Plant.

66.  La Plata's demolition of the sediment tank during remodeling activities in 1985 cuased the release of Solvents that are the primary source of the contamination that is found in the area to the east of the Jail continuing to the Property boundary.

67.  As explained by Dr. Huntington, the TCA in the sediment tank would degrade by hydrolosis leaving behind 1,4 dioxane and TCE.  The higher levels of TCE and 1,4 dioxane relative to TCA that are found to the east of the Jail are therefore consistent with the sudden release of the sediment tank's contents when it was demolished by Mr. Lucas.  The Solvents present in the tank were likely spread in the area east of the Jail as a result of  Mr. Lucas and others performing construction/excavation work for La Plata on the east side of the Jail staging contaminated soils and using them as backfill together with flowing water from leaking sewer lines.

68.  Dr. Huntington characterized the higher TCE and 1,4 dioxane concentrations relative to TCA as a unique chemical fingerprint that can be observed in the groundwater, soil, and soil gas samples east of the Jail.

69.  Although there is some variation in the ratios of Solvents in the groundwater on the east side of the Jail, the overall pattern is consistent.  Furthermore, the variation in the ratios is consistent with the different properties of the various Solvents.  Specifically, 1, 4 dioxane dissolves completely in water and moves with it whereas TCA forms a phase when it is mixed

with water and moves by vapor phase transport as well as with water.  This difference in how 1,4

dioxane and TCA are transported explains the variations in the relative levels of 1,4 dioxane and

TCA to the east of the Jail.

70.  Dumping of Solvents by Ms. Silva and Mr. Barnes; leaks or releases of Solvents

from the dumpster near the Plant's former loading dock; leaks or releases of Solvents from

drums stored on the Plant's former loading dock; and leaks or releases of Solvents that were

dumped down the sinks of washed down the floor trenches while the Plant was in operation from

leaking underground pipes have all been offered by La Plata as possible sources of the

contamination to the east of the Jail.  Even if there was evidence to support that each of these

things occurred, none of these sources would yield the level of hydrolosis necessary to produce

the high level of 1,4 dioxane relative to TCA that is present on the east side of the Jail.  Instead,

Solvent contamination from these sources would produce higher levels of TCA relative to 1,4

dioxane.  These sources could therefore only be responsible for minimal Solvent contamination

in the area to the east of the Jail and continuing to the Property boundary.

71.  There is no direct evidence of any release of Solvents by any third party at or near

the areas of offsite contamination. This is not surprising given the amount of time that has passed

and the potential liability of any third party responsible for such a release.  There is evidence,

however, that Solvents were used by third parties at or near the areas of offsite contamination.

72.  Notwithstanding the lack of direct evidence of any release of Solvents offsite, I find

that much of the offsite contamination is attributable to a source other than operations at the

Plant or La Plata's demolition of the sediment tank.  Specifically, the significantly higher levels

of TCA in groundwater that are found in the offsite monitoring wells can only be explained by a

separate source from that which is responsible for groundwater contamination on the Property.

73.  The Solvents detected in the indoor air at the Jail are the result of vapor intrusion caused by Solvent contamination underneath the Jail.  As set forth previously, the contamination underneath the Jail was caused solely by manufacturing operations at the Plant.

**K.  Human Health and Environmental Risks Associated with Contamination on the Property**

74.  Paul Rosasco, president of EMSI and an expert witness for La Plata, and Christine Halmes, expert witness for Brown Group, agree that the levels of TCA and 1,4 dioxane detected in soil, indoor air, and groundwater do not present a risk to human health.  Accordingly, the only Solvent that is of any concern with respect to human health is TCE.

75.  La Plata has produced a Baseline Human Health Risk Assessment (the "Health Risk Assessment") prepared by Carolyn Fordham of Terra Technologies Environmental Services, L.L.C. with Mr. Rosasco's input and oversight.   For the reasons set forth in the conclusions of law section, I have considered Mr. Rosasco's testimony regarding this assessment in making my factual findings over the objection of Brown Group.

76.  Relying on guidance from the EPA, the Health Risk Assessment identifies staff at the Jail, inmates at the Jail, and potential future residents as categories at risk as a result of the TCE contamination at and near the Property, and evaluates the risk presented.

77.  To evaluate the risk of exposure to indoor air contaminated with TCE, the Health Risk Assessment assumes exposure to 2.9 micrograms per cubic meter, which is the highest concentration of TCE that was detected in a single sample.  In this way, the Health Risk Assessment does not reflect a reasonable exposure scenario for staff or inmates at the Jail.  In any event, Dr. Halmes, the only toxicologist to testify at trial, opined that exposure to a TCE

-17-

concentration of 2.9 micrograms per cubic meter over any period of time would not present a risk to human health.

78.   Regulatory screening levels, action levels, and standards do not identify real or actual risks to human health.  Rather, these regulations are designed to protect the public health by identifying the level of chemical exposure at which there is no threat of harm with a large margin of error.  Exceedance of regulatory screening levels, action levels, or standards therefore does not demonstrate a real or actual risk to human health.

79.   La Plata, through its consultants, has developed a Materials Management Plan to address the risks presented to construction and maintenance workers from the TCE contamination in the subsurface soil and groundwater at the Property.

80.   There is no evidence that the Property will ever be converted to residential use or that the groundwater on the Property will be used for drinking water or any other purpose. Institutional controls such as deed restrictions can be utilized to prevent such future uses.

81.   There is no current or likely future risk or endangerment to human health from the contamination at the Property or offsite.

82.   There is no evidence of any risk, threat, or endangerment to any animals, plants, or other ecological receptors from the contamination at the Property or offsite.

83.   The only evidence of a current or future risk or endangerment to the environment from the contamination at the Property and offsite is the fact that the concentrations of Solvents in the groundwater exceed applicable governmental standards.

**L.  The State of Colorado's Involvement with the Investigation and Cleanup of the Property**

84.  La Plata notified the Colorado Department of Public Health and the Environment ("CDPHE") of the results of Plateau's initial investigation of contamination at the Property in 2003 and continued to communicate periodically with CDPHE about its investigation over the years that followed.

85.  CDPHE has not issued any administrative orders regarding the Property, and La Plata is not participating in CDPHE's voluntary cleanup program ("VCUP").  La Plata is, however, voluntarily investigating contamination at the Property under the paid oversight of CDPHE.

86.  La Plata, through EMSI, has provided CDPHE with copies of its remedial investigation report, feasibility study, sampling and analysis plans and results, and other documents relating to the contamination at the Property and offsite.  La Plata has received comments from CDPHE on some of these submissions but is still awaiting comment on the feasibility study which includes the proposed cleanup plan.

**M.  La Plata's Ongoing Investigation of Contamination at the Property**

87.  After it was retained in January of 2008, EMSI did additional sampling and analysis of the Solvent contamination and began drafting a remedial investigation report and a feasibility study.  The remedial investigation report and the feasibility study were finalized in August of 2010.

88.  The feasibility study evaluates seven potential remedial alternatives and identifies the recommended alternative.  The recommended alternative involves in-situ chemical oxidation ("ISCO"), which is the injection of an oxidant into the groundwater through a series of injection

wells to destroy the contaminants that are present.

89.  EMSI originally anticipated completing a community relations plan by March 28, 2008.  The community relations plan was not prepared, however, until August of 2010.

90.  After completion of the community relations plan, meetings were held for the public, inmates at the Jail, and the staff of the sheriff's office.  Prior to these meetings, La Plata had a few informal discussions with some adjacent landowners and government officials but there is no evidence that any interested party, other than Brown Group, was given an opportunity to comment on decisions relating to the Property prior to August of 2010.

**N.  Recoverable Costs**

91.  At the end of trial, La Plata requested judgment for costs already incurred in connection with the contamination at the Property through August 1, 2010 in the amount of $830,078, exclusive of prejudgment interest.  Of this total amount, $63,319 represents costs associated with the May 2010 sediment tank excavation; $33,600 represents attorney fees incurred seeking insurance coverage relating to contamination at the Property; and $8,800 represents attorney fees associated with a cost database maintained by attorneys for La Plata.

92.  Brown Group stipulates that $232,783 of the amount requested by La Plata represent reasonable and necessary response costs incurred by La Plata.  Brown Group objects, however, to the recovery of any costs by La Plata based on its alleged failure to substantially comply with the requirements of the National Contingency Plan ("NCP"), an issue that will be analyzed in the conclusions of law section.  Brown Group does not include any costs or fees associated with the May 2010 sediment tank excavation; La Plata's insurance recovery efforts; or the cost database maintained by attorneys for La Plata in the stipulated amount.

93.   Part of the difference in the parties' respective positions on La Plata's reasonable and necessary response costs is attributable to differing opinions about the recovery of attorney fees incurred for investigatory work.  Lori Potter, expert witness for La Plata, opines that La Plata is entitled to recover $119,546 in non-litigation attorney fees through October 1, 2009 while Leslie Larson, expert witness for Brown Group, opines that La Plata is entitled to recover $68,590 in non-litigation attorney fees through this same time period.  Ms. Potter further opines that La Plata is entitled to recover an additional $21,544 in non-litgation attorney fees after October 1, 2009.  Ms. Larson offered no opinion on the recoverability of non-litgation attorney fees after October 1, 2009.  Analysis of the opinions of Ms. Potter and Ms. Larson is set forth in the conclusions of law section.

94.   Another portion of the difference in the parties' respective positions on La Plata's reasonable and necessary response costs is attributable to opposing views on the inclusion of approximately $100,000 for groundwater sampling in 2009 and soil gas sampling in 2007 - 2008 in the stipulated categories of recoverable costs; a purported lack of back-up documentation for approximately $83,000 in costs in the stipulated categories; and purportedly insufficient information for approximately $12,000 in costs in the stipulated categories.  Because there is some overlap between these three areas of dispute regarding the stipulated categories of costs, they account for a difference of approximately $120,000 of the difference between the parties' respective positions on La Plata's reasonable and necessary response costs.  I am satisfied that the disputed sampling costs represent reasonable and necessary costs of response and that La Plata has made the appropriate deductions to account for undocumented costs.

95.   The remaining difference in the parties' respective positions on La Plata's reasonable

and necessary response costs is attributable to differing views on other appropriate categories of recoverable costs. With the exception of costs or fees associated with the May 2010 sediment tank excavation; La Plata's insurance recovery efforts; and the cost database maintained by attorneys for La Plata, which will be addressed in the conclusions of law section, I am satisfied that these disputed categories represent reasonable and necessary response costs. Specifically, I am satisfied that these categories of costs including significant NCP-required activities were incurred determining the source or sources of contamination and the associated risks, the identity of responsible parties, and the necessary response actions.

96. Brown Group did not present any evidence a trial to support an award of reasonable and necessary response costs in its favor.

**O. Scope and Cost of Remediation**

97. La Plata's proposed remediation plans are limited to the Property. La Plata is not proposing any remediation at offsite properties.

98. Based on the limited detections of contamination and the applicable regulatory standards, no remediation or further monitoring of the indoor air at the Jail is necessary and no associated costs are recoverable.

99. Excess levels of Solvents in soil on the Property are limited to TCE and are found only in the areas near the former sediment tank, the municipal sewer line, and to the northwest of the Jail. It is likely that La Plata will continue to use the Property as a jail site for many years though it plans additional construction requiring excavation to a depth of 8-10 feet. It is entirely speculative that the Property will ever be converted to residential use. Accordingly, institutional controls including deed restrictions and health and safety plans are sufficient to address soil

contamination on the Property, and no costs associated with soil excavation are recoverable at the present time.

100.  Mr. Rosasco opines that the institutional controls needed to address the soil contamination on the Property will cost $32,000.  David  Folkes, expert witness for Brown Group, opines that these controls will cost $1,000 over a period of 25 years.  Essentially then, La Plata and Brown Group's experts are in agreement that it will cost approximately $30,000 to implement and maintain the necessary institutional controls.

101.  La Plata and Brown Group agree that some remedial measures are necessary to address the contamination of groundwater with TCE and 1,4 dioxane.  The parties also agree that the goal of these measures should be to meet state groundwater standards.  The parties disagree, however, as to the scope of the remedial measures needed to ensure that groundwater flowing from the Property meets the state groundwater standards at the Property line.

102.  Although La Plata and Brown Group agree that ISCO using persulfate would effectively remediate excess TCE and 1,4 dioxane in groundwater on the Property, Mr. Rosasco proposes that injection wells be placed along the east and west side of the Jail while Mr. Folkes opines that it is only necessary to place injection wells along the east side of the building and at the northwest corner of the Jail, which are the areas of with the highest concentrations of TCE and 1,4 dioxane contamination in groundwater.  Mr. Rosasco also proposes two ISCO injections while Mr. Folkes believes that a single injection might well be sufficient.

103.  At trial, Mr. Rosasco acknowledged that Mr. Folkes' ISCO proposal would be a reasonable starting point and has the potential to reduce the total cost of remediating the groundwater if it is successful.  Mr. Rosasco cautioned, however, that the total cost of

remediating the groundwater might end up costing more than his estimated amount if Mr.

Folkes' proposal does not resolve the groundwater contamination on the Property.  Given that

the highest concentrations of groundwater contamination on the Property are located near the

former sediment tank, the municipal sewer line, and the northwest of the Jail, Mr. Folkes

proposal for 18 ISCO injections wells on the east side of the Jail and 3 at the northwest corner of

the Jail is the more reasonable alternative.  Mr. Folke's proposal for a single ISCO injection is

likewise a more reasonable starting point.

104.  Mr. Folkes estimated that the capital cost of the 21 injections wells he proposes be

installed on the Property would be $486,100.  Mr. Folkes estimated that the follow-up

groundwater monitoring would cost $77,600 over a period of eight years.  These cost estimates

are reasonable.

## II.  Conclusions of Law

### A.  La Plata's RCRA Claim

1.  "RCRA is a comprehensive statute designed to reduce or eliminate the generation of

hazardous waste and to minimize the present and future threat to human health and the

environment created by hazardous waste."  *Crandall v. City & County of Denver, Colo.,* 594

F.3d 1231, 1233 (10th Cir. 2010) (citations omitted).  A private party may bring suit under

RCRA "against any person ... who has contributed or who is contributing to the past or present

handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which

may present an imminent and substantial endangerment to health or the environment."  42

U.S.C. § 6972(a)(1)(B).

2.  Once certain notice and enforcement requirements not challenged by Brown Group

are met, Section 6972(a)(1)(B) requires a plaintiff to prove: (1) that the defendant is a person; (2) that the defendant contributed to, or is contributing to, the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that such waste may present an imminent and substantial endangerment to health or the environment. *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1020 (10th Cir. 2007). There is no dispute that Brown Group is a person who contributed to the handling or disposal of solid or hazardous waste. I therefore direct my analysis to whether the Solvent contamination at the Property and offsite may present an imminent and substantial endangerment to health or the environment.

3. RCRA's use of the "expansive" term "may present" "is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Burlington*, 505 F.3d at 1020. *Id.* (citations and internal quotations omitted). However, "there is a limit to how far the tentativeness of the word *may* can carry a plaintiff." *Crandall,* 594 F.3d at 1238. In particular, the term "may present" quite clearly excludes waste that no longer presents an imminent endangerment. *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 485-6 (1996). Endangerment to health or the environment is "imminent" if it threatens to occur immediately. *Meghrig,* 516 U.S. at 485. This is not to say that a plaintiff must show that actual harm will occur immediately as long as the risk of threatened harm is present. *Burlington*, 505 F.3d at 1020.

4. The term "endangerment" means a "threatened or potential harm." *Id.* Endangerment is "substantial" under RCRA when it is "serious," and when "there is reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken." *Id.* at 1021 (citations

omitted).  "[I]f an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." *Interfaith Cmty. Org. V. Honeywell Int'l, Inc.,* 399 F.3d 248, 259 (3d Cir. 2005).

5.  La Plata relies on the conclusions in the Health Risk Assessment to establish that the Solvent contamination at the Property and offsite may present an imminent and substantial endangerment to human health.  Since Ms. Fordham did not testify at trial, the Health Risk Assessment itself is inadmissible as hearsay under Fed. R. Evid. 801 & 802.  Brown Group argues that Mr. Rosasco's trial testimony about Ms. Fordham's conclusions is also inadmissible under Fed. R. Evid. 702 and 703.  *See* Doc. # 278.

6.  Under Rule 702, testimony by a witness qualified as an expert by knowledge, skill, experience, training, or education is admissible when it assists the trier of fact; is based on sufficient facts and data; is the product of reliable principles and methods; and the witness has reliably applied the principles and methods to the facts of the case.  Under Rule 703, an expert witness may rely on facts, data, and opinions of other experts that are not admissible in evidence if they are of a type relied upon by experts in a particular field in forming opinions or inferences upon the subject.  Fed. R. Evid. 703; *TK-7 Corp. v. Estate of Ihsan Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).

7.  Based on Mr Rosasco's testimony at trial, I am satisfied that he formed his own opinions about the risk to human health presented by the Solvent contamination at the Property and offsite.  Although these opinions were formed largely through reliance on the Health Risk Assessment, I am further satisfied that such reliance was reasonable in light of Mr. Rosasco's supervision of and direct involvement in Ms. Fordham's work; his previous experience with

health risk assessments as a component of a CERCLA-compliant remediation; and the general role/responsibilities of risk managers such as Mr. Rosasco. I therefore conclude that Mr. Rosasco's trial testimony regarding the conclusions in the Health Risk Assessment is admissible under Fed. R. Evid. 702 and 703.

8. Although I considered Mr. Rosasco's testimony regarding the conclusions in the Health Risk Assessment, I have found that the facts do not support a finding that there is a current or likely future risk or endangerment to human health from the Solvent contamination at the Property and offsite. It follows that La Plata has failed to prove that this contamination presents an imminent and substantial endangerment to human health under the standards set forth above.

9. La Plata relies on two facts to establish that the Solvent contamination at and near the Property may present an imminent and substantial endangerment to the environment: (1) there are levels of Solvents in groundwater and soil that exceed the applicable governmental standards; and (2) the CDPHE is overseeing La Plata's investigation and cleanup of the contamination.

10. Other courts have recognized that "[p]roof of contamination in excess of state standards may support a finding of liability, and may alone suffice for liability in some cases." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 212 (2d Cir. 2009) (*quoting Interfaith Cmty. Org., supra,* 399 F.3d at 261). In *Cordiano*, the Second Circuit nonetheless concluded that soil, wetland sediment, and wetland surface water samples showing levels of lead that exceeded various state regulatory standards were insufficient evidence for a reasonable jury to find an imminent and substantial endangerment to the environment. *Id.*

11.   Although the Third Circuit in *Interfaith* held that there was sufficient evidence to establish that site contamination presented an imminent and substantial endangerment to the environment, the Court cited far more evidence than the exceedance of governmental standards in support of this holding.  Among other things, the Third Circuit noted evidence of present and continuing pathways for exposure including evidence that contaminated groundwater was discharging into a river and evidence of animals and other living organisms with a high mortality rate at and around the contaminated site.  *Interfaith Cmty Org., supra,* 399 F.3d at 261-62. Furthermore, the contamination at issue in *Interfaith* exceeded all state standards for soil, groundwater, surface water, and river sediment by a significant degree with levels ranging from 75 to 2,000 times higher than the applicable standards.  *Id.* at 261.

12.   While certain governmental standards are exceeded in some instances by contamination at the Property and offsite, the evidence in this regard is not as compelling as that presented in *Interfaith*.  La Plata therefore cannot establish that the Solvent contamination presents an imminent and substantial endangerment to the environment based solely on this evidence.  I therefore consider whether the evidence of contamination in excess of governmental standards and the CDPHE's involvement with La Plata's investigation and cleanup of the contamination cumulatively establish that the Solvent contamination at the Property and offsite presents an imminent and substantial endangerment to the environment.

13. As set forth above, CDPHE is providing paid oversight of La Plata's investigation and remediation of the Property.  This fact, as well as correspondence admitted at trial, demonstrates interest and concern on the part of CDPHE with the contamination at the Property and offsite.  It does not follow that the CPPHE considers the Solvent contamination to present an

-28-

imminent and substantial endangerment to the environment.  Indeed, the fact that the CDPHE

has been aware of the contamination for over seven years but is allowing La Plata to proceed

with its investigation and remediation at a deliberative pace suggest that the opposite is true.

CDPHE's involvement with the site investigation and remediation therefore does not provide

additional evidence of an imminent and substantial endangerment to the environment.  Since the

mere exceedance of applicable govenermental standards is insufficient evidence for this purpose

under the facts of this case, La Plata has failed to establish that the Solvent contamination

presents an imminent and substantial endangerment to the environment.

14.  Having failed to prove that the Solvent contamination at the Property and offsite may

present and imminent and substantial endangerment to health or the environment, La Plata's

claim against Brown Group under Section 6972(a)(1)(B) of RCRA must fail.

**B.  CERCLA Claims**

15.  CERCLA is designed "to facilitate the prompt cleanup of hazardous waste sites and

to shift the cost of environmental response from the taxpayers to the parties who benefitted from

the wastes that caused the harm."  *Pub. Serv. Co. of Colo. v. Gates Rubber Co.,* 175 F.3d 1177,

1181 (10th Cir. 1999) (citation omitted).  CERCLA authorizes a cause of action to recover costs

a party incurs investigating and remediating a contaminated site including future costs.  42

U.S.C. § 9607(a) ("CERCLA § 107(a)") & 9613(g)(2) ("CERCLA § 113(g)(2)").  In addition,

CERCLA allows a responsible person to seek contribution from any other person who is liable

or potentially liable under CERCLA § 107(a).  42 U.S.C. § 9613(f)(1) ("CERCLA § 113(f)(1)").

16. La Plata asserts claims against Brown Group for cost recovery under CERCLA §

107(a); contribution under CERCLA § 113(f)(1); and declaratory judgment under CERCLA §

113(g)(2).  Brown Group dismissed its counterclaim against La Plata for cost recovery under

CERCLA § 107(a) at the outset of trial but continues to assert counterclaims against La Plata for

contribution under CERCLA § 113(f)(1); and declaratory judgment under CERCLA § 113(g)(2)

and the Declaratory Judgment Act, 28 U.S.C. § 2201.

### 1. La Plata's CERCLA § 107(a) Cost Recovery Claim

17.  To prevail on its CERCLA § 107(a) claim against Brown Group,  La Plata must

prove that (1) there is a facility as defined in 42 U.S.C. § 9601(9); (2) Brown Group is a

responsible person as defined in 42 U.S.C. § 9607(a); (3) a release or threatened release of a

hazardous substance has occurred; (4) the release or threatened release of a hazardous substance

has caused La Plata to incur response costs; (5) La Plata's costs were "necessary" costs of

response; and (6) La Plata's response action was consistent with the national contingency plan

("NCP").  *See e.g. Young v. United States,* 394 F.3d 858, 862 (10th Cir. 2005).

18.  CERCLA defines "facility" broadly to include "[a]ny building, structure, installation,

equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works),

well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling

stock, or aircraft, or ... any site or area where a hazardous substance has been deposited, stored,

disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).  The parties have

stipulated that the Property contains one or more CERCLA "facilities."  Specifically, the

relevant CERCLA facilities are the Plant/Jail and the sediment tank.

19.  CERCLA § 107(a) identifies four categories of "covered persons" who are

potentially liable under the statute including (1) the owner and operator of a facility where a

hazardous substance is found; and (2) any person who owned or operated a facility at the time

hazardous substances were disposed of there.  42 U.S.C. § 9607(a)(1) &(2).  Brown Group is a

"covered person" under Section 107(a)(2).  The Plummer Defendants are also "covered persons"

under Section 107(a)(2).

20.  The parties have stipulated that TCE, TCA, and 1,4 dioxane are hazardous

substances and that there has been a release or threatened release of hazardous substances at the

Property.

21.  "CERCLA 'response costs' are defined generally as the costs of investigating and

remedying the effects of a release or threatened release of a hazardous substance into the

environment."  *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1512 n.7 (10th Cir. 1991).  The

evidence establishes that La Plata has incurred response costs.  However, not all of the costs

claimed by La Plata qualify as "necessary costs of response" under CERCLA § 107(a)(4)(B).

22.  In *Key Tronic Corp. v. United States,* 511 U.S. 809, 819-20 (1994)*,* the Supreme

Court noted that though attorney fees associated with bringing a cost recovery action are not

recoverable under CERCLA § 107(a), "some lawyers' work that is closely tied to the actual

cleanup may constitute a necessary cost of response in and of itself under the terms of §

107(a)(4)(B)."  Thus, the Supreme Court held that attorney fees the plaintiff incurred for work

performed in identifying other potentially responsible parties were recoverable under Section

107(a) because this work might well be performed by non-lawyers and it increased the

probability that a cleanup would be effective and paid for.  *Id.* at 820.  Conversely, the Supreme

Court held that attorney fees plaintiff incurred in negotiating a consent order with the EPA were

not recoverable under CERCLA since these negotiations primarily served to protect the

plaintiff's interests though they may have also affected the ultimate scope and form of the

cleanup. *Id.*

23.  Included in the $830,078 in costs La Plata that seeks to recover are $33,600 in attorney fees incurred seeking insurance coverage relating to the Solvent contamination and $8,800 in attorney fees associated with maintaining a cost database.  Based on the evidence presented at trial, I conclude that La Plata has failed to demonstrate that these fees significantly benefitted efforts to cleanup the Solvent contamination.  Rather, these fees were incurred primarily to assist with the litigation and to serve La Plata's interests by shifting responsibility for costs elsewhere.  Accordingly, these attorney fees do not qualify as recoverable response costs under CERCLA and shall be deducted from the total amount of costs claimed by La Plata.

24.  Brown Group also asserts that not all of the attorney fees La Plata identifies as investigatory costs qualify as CERCLA response costs.  Ms. Larson, Brown Group's expert on this issue, opined that only $68,590 of the $116,346 in investigatory attorney fees billed by the Berg Hill firm through October 1, 2009 and identified by Ms. Potter as recoverable qualify as CERCLA response costs.   The differing opinions of Ms. Larson and Ms. Potter are attributable to different approaches to block billing, *i.e.* whether a time entry that was not broken down by task should be stricken in its entirety when fees associated with one or more of the included tasks are not recoverable, and the recovery of investigatory attorney fees relating to expansion of the Jail; analysis of Applicable and Relevant or Appropriate Requirements ("ARARS"); and a 2009 diesel oil spill.

25.  Clearly, it would have been preferable for the Berg Hill firm not to utilize block billing.  It is within my discretion, however, to award reasonable attorney fees for appropriate tasks included in block billing entries.  *See e.g. Hamilton v. Boise Cascade Express,* 519 F.3d

1197, 1207 (10th Cir. 2008) (noting that district court enjoys "wide discretion" in making decisions on attorney fee awards).  Based on her considerable experience in cases of this type, Ms. Potter estimated the amount of time spent on tasks for which fees were not recoverable and reduced the amount of block billed entries accordingly.  I am satisfied that appropriate reductions were taken from the Berg Hill firm's block billed entries and decline to penalize La Plata for the use of this billing practice.  Based on Ms. Potter's testimony, I am also satisfied that the Berg Hill firm's attorney fees tied to expansion of the Jail; analysis of ARARS; and the 2009 diesel oil spill are closely tied to the cleanup of the Solvent contamination and therefore qualify as response costs under CERCLA.  Because Ms. Potter conceded on cross-examination that an additional, approximate $600 in fees should have been stricken because they relate to litigation of this case, I conclude that $115,746 of the Berg Hill firm attorney fees that are identified as investigatory costs thorough October 1, 2009 qualify as CERCLA response costs.

26.   Ms. Larson opined that none of the attorney fees billed by the Rogers firm qualified as recoverable response costs under CERCLA while Ms. Potter opined that $3,200 of these fees were recoverable.  I conclude that La Plata has failed to meet its burden on this issue due to the heavy redaction of the Rogers firm invoices.  Accordingly, $3,200 shall be deducted from the total amount of costs claimed by La Plata.

27.   Ms. Larson offered no opinion as to the additional $21,544 in attorney fees incurred after October 1, 2009 that Ms. Potter opined were recoverable as investigatory costs.  Included in this $21,544 are attorney fees relating to the sediment tank excavation in May of 2010.  The sediment tank excavation, and certainly any related attorney fees, were primarily driven by La Plata's defense of Brown Group's claim that La Plata's handling of the sediment tank was

responsible for at least a portion of the Solvent contamination at the Property and offsite though it may have also yielded information useful to determining the nature and scope of remediation. Accordingly, La Plata cannot meet its burden of demonstrating that attorney fees relating to the 2010 sediment tank excavation qualify as response costs under CERCLA. Furthermore, given that La Plata itself demolished the tank years earlier, I conclude that attorney fees relating to this excavation were not "necessary" costs of response in any event.

28. At trial, Ms. Potter conceded that many of the attorney time entries that she reviewed for April and May of 2010 related to the 2010 sediment tank excavation. Without the benefit of the actual time entries for those months, the only way to ensure that La Plata does not recover attorney fees relating to the 2010 sediment tank excavation is to strike all fees for April and May of 2010 which total $19,069. Thus, only $2,475 in non-litigation attorney fees that La Plata incurred after October 1, 2009 qualify as recoverable response costs under CERCLA.

29. As to whether the other disputed costs relating to the 2010 sediment tank excavation were "necessary," this term requires that there be a nexus between the alleged response cost and an actual effort to respond to environmental contamination. *Young*, *supra*, 394 F.3d at 863. La Plata removed the tank in 1985 and knew or should have know that the 2010 excavation seeking to find the tank was futile and not necessary to the containment and cleanup of the Solvent contamination at the Property and offsite. The $63,319 in costs claimed by La Plata relating to the 2010 excavation therefore do not constitute "necessary costs of response" and are not recoverable under CERCLA.

30. Deducting the amounts discussed above plus an additional $6,693 that Mr. Rosasco agreed should be deducted from the amount billed by Plateau, I conclude that La Plata has

incurred reasonable and necessary response costs under CERCLA in the amount of $694,797.

31.   The final element of a prima facie case under CERCLA § 107(a) is consistency with the NCP. *Young*, *supra*, 394 F.3d at 862.   The NCP, 400 C.F.R. pt. 300, is a detailed list of procedures and requirements promulgated by the EPA at Congress' direction to produce an "efficient, coordinated, and effective response" to releases of  hazardous substances.   400 C.F.R. § 300.3(b).  *See also* 42 U.S.C. § 9605; *Morrison Enters. v. McShares, Inc.,* 302 F.3d 1127, 1136 (10th Cir. 2002).  The NCP provides that "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in [40 C.F.R. § 300.700(c)(5) &(6)], and results in a CERCLA-quality cleanup."  40 C.F.R. § 300.700(c)(3)(i).

32.   Paragraphs (5) and (6) under Section 300.700(c) list requirements that are "potentially applicable" to private response actions including requirements relating to worker health and safety; site investigations; remedy selection; and opportunities for public comment and participation.  *Id.*  Meanwhile, a "CERCLA-quality cleanup" under 40 C.F.R. § 300.700(c)(3)(i) is a response action that "(1) protects human health and the environment, (2) utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable, (3) is cost-effective, (4) satisfies [ARARS] for the site, and (5) provides opportunity for meaningful public participation."  *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 543 (6th Cir. 2001) (citing Preamble to NCP, 55 Fed. Reg. 8666-01, 8793 (March 9, 1990)).

33.   The specific NCP requirements applicable to a particular response action depend on whether the action is a "removal action," which is a short-term response to reduce the immediate

-35-

threat from the hazardous substance release, or a "remedial action," which is a response action intended to permanently reduce or eliminate the threat from the release when there is no immediate threat to public health. *Morrison Enters.*, *supra*, 302 F.3d at 1136.  Here, La Plata asserts that its response to the Solvent contamination at the Property and offsite is a remedial action, and the evidence including the amount of time that has lapsed since the discovery of the contamination supports this characterization. *See United States v. W.R. Grace & Co.,* 429 F.3d 1224, 1234-35 (9th Cir. 2005) ("The decision to select a removal or remedial action is ... distinct from the question whether the action carried out was, in fact, the action selected.").  La Plata's response action is therefore subject to the "more detailed and onerous" NCP requirements for remedial actions. *Morrison Enters.*, *supra.*

34.  La Plata argues that NCP consistency is only a prerequisite to the recovery of cleanup costs and not investigatory costs including costs of site monitoring, assessment, and evaluation.  There is case law supporting this view. *See e.g. Vine Street, LLC v. Keeling,* 460 F. Supp. 2d 728, 759-60 (E.D. Tex. 2006) ("[P]reliminary investigatory and monitoring costs ... are recoverable irrespective of the NCP's public participation requirements."); *A.S.I., Inc. v. Sanders,* 1996 WL 91626, at *6-7 (D. Kan. Feb.9, 1996) (citing cases to show "[a] substantial line of authority" holding that costs of initial investigation and monitoring are recoverable without a showing of NCP-compliance.).  However, there is also case law supporting the opposing view advanced by Brown Group that investigatory costs are not exempt from the requirement of NCP consistency. *See e.g. Aviall Servs., Inc. v. Cooper Indus, LLC,* 572 F. Supp. 2d 676, 697 (N.D. Tex. 2008) ("[C]omplete immunization of investigatory response costs from the requirement of NCP consistency is contrary to the text of CERCLA."); *Angus Chem. Co. v.*

*Mallinkrodt Group, Inc.,* 1997 WL 280740 at * 1 (W.D. La. Mar. 4, 1997) (under the plain language of CERCLA, a plaintiff must demonstrate that it complied with the NCP before it is entitled to recover its investigative and monitoring costs).

35.   Having reviewed the cited cases, I conclude that the plain language of CERCLA dictates that NCP consistency is a prerequisite to the recovery of investigatory costs associated with the release of a hazardous substance.  Section 107(a)(4)(B) establishes liability for "necessary costs of response incurred ... consistent with the national contingency plan." "CERCLA 'response costs' are defined generally as the costs of *investigating* and remedying the effects of a release or threatened release of a hazardous substance into the environment." *Tinney*, *supra*, 933 F.2d  at 1512 n.7 (10th Cir. 1991) (emphasis added).  Accordingly, I agree that it would contravene the plain language of CERCLA to hold that investigatory costs are exempt from the requirement of NCP consistency.  *See Aviall Servs., Inc., supra; Angus Chem. Co., supra.*  La Plata must therefore prove that its investigatory costs were incurred consistent with the NCP in order to recover them from Brown Group under CERCLA § 107(a).

36.   Brown Group does not dispute that La Plata's response action to address the Solvent contamination at the Property and offsite has been consistent with the NCP apart from the NCP requirements relating to opportunities for public participation and comment.  Indeed, the evidence presented at trial establishes that La Plata has published a remedial investigation report and a feasibility study pursuant to agency guidelines that are supported by extensive site assessment and investigation.  In determining whether La Plata's response action, as a whole, is in substantial compliance with the applicable requirements in 40 C.F.R. § 300.700(c)(5) &(6) then, I focus on La Plata's public outreach efforts but in the context of its overall response

action.

37.  Section 300.700(c)(6), 40 C.F.R., provides that "[p]rivate parties undertaking response actions *should* provide an opportunity for public comment concerning the selection of the response action based on the provisions set out below, or based on substantially equivalent state and local requirements."  (Emphasis added).  The use of the word "should" suggests that adherence to the specific provisions identified is encouraged though not mandatory.  *Accord Norfolk S. Ry. Co. v. Gee. Co.,* 2002 WL 31163777 at *28 (N.D. Ill. Sept. 30, 2002).  *See also* 55 Fed. Reg. 8666, 8795 (1990) ("EPA has decided that providing public participation opportunities should be a condition for cost recovery under CERCLA[;]" however, "rigid adherence to a set of procedural requirements" is not required); *id.* at 8793 (Section 300.700(c)(6) represents a "universe of requirements which are potentially relevant" but this list "should not be construed as a fixed list of requirements that must be met in order for a party to qualify for cost recovery under CERCLA ...").

38.  Some of the specific provisions identified in Section 300.700(c)(6) as  "potentially applicable" to private party response actions clearly do not apply in this case.  *See* 40 C.F.R. §§ 300.155 (addressing the occurrence of specific "incidents"); 300.415(n) (addressing community relations in removal actions) & 300.435(c) (addressing community relations during the remedial design/remedial action stage).  One of the specific provisions listed in Section 300.700(c)(6) that is "potentially applicable" in this case is Section 300.430(c), which addresses community relations during the remedial investigation/feasibility study ("RI/FS") stage of a remedial action. Section 300.430(c) provides that the party undertaking the RI/FS shall, to the extent practicable, prior to commencing field work for the remedial investigation:

(i) [Conduct] interviews with local officials, community residents, public interest groups, or other interested or affected parties, as appropriate, to solicit their concerns and information needs, and to learn how and when citizens would like to be involved in the Superfund process[; and]

(ii) [Prepare] a formal community relations plan (CRP), based on the community interviews and other relevant information ... to: (A) Ensure the public appropriate opportunities for involvement in a wide variety of site-related decisions...; and (C) Provide appropriate opportunities for the community to learn about the site.

39.   There are no residential neighborhoods directly impacted by the Solvent contamination at the Property and offsite, and no community organizations have ever contacted La Plata about this issue despite local media coverage.  Issues relating to the contamination have been discussed at board meetings open to the public, and La Plata has talked to adjacent landowners. Under these circumstances, La Plata's failure to conduct widespread interviews prior to commencing field work for its remedial investigation is an "immaterial and insubstantial deviation" from the technical NCP requirements which are not mandatory in any event.  *See* 40 C.F.R. § 300.700(c)(4) (actions will not be considered not "consistent with the NCP" based on "immaterial or insubstantial deviations" from applicable provisions).  La Plata's failure to prepare a community relations plan prior to commencing field work for its remedial investigation is likewise an "immaterial and insubstantial deviation" from the technical NCP requirements.  La Plata has now implemented a community relations plan, and the public will have additional opportunities to learn about the site and comment on the proposed remedial actions which have yet to be undertaken.   In sum, while La Plata might have done more to involve the public in RI/FS stage of its remedial action, those actions that it has taken, when evaluated as a whole, are sufficient to meet the substantial compliance standard of the NCP.

40.   Based on the evidence available to date, I also conclude that La Plata's remediation

action will result in a "CERCLA -quality cleanup" with the limitations on the proposed cost and scope of the cleanup set forth later in this Order.

41. La Plata has proven all the elements of its claim against Brown Group under CERCLA § 107(a). The Plummer Defendants are also liable on this claim by virtue of the default judgment entered against them. *See* Doc. No. 92. I must now determine the extent of Defendants' liability.

42. CERCLA does not mandate joint and several liability in every case. *Burlington N. & Santa Fe Ry. Co. v. United States,* – U.S. –, 129 S. Ct. 1870, 1881 (2009). Instead, the scope of liability is determined from principles of common law. *Id.* In particular, courts look to § 433A of the *Restatement (Second) of Torts*, which provides that

> Damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm.

*Id.* Not all harms are capable of apportionment, however, and "courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm. *Id.* (*quoting Restatement (Second) of Torts,* § 433A, cmt. i). *See also United States v. Hercules, Inc.,* 247 F.3d 706, 718-19 (8th Cir. 2001) (when in doubt, district courts should impose joint and several liability rather than settle on a compromise amount that they think best approximates the relative responsibility of the parties). Equitable considerations have no relevance to the apportionment of liability under CERCLA § 107(a); rather, this apportionment must be based on evidence supporting the divisibility of damages. *Burlington N. & Santa Fe Ry. Co., supra,* 129 S.Ct. at 1882 n. 9.

43. Despite the fact that I have found that the Solvent contamination at the Property and

offsite can loosely be divided into three general areas, it does not follow that Brown Group has

met its burden of demonstrating that each of these areas represents a distinct harm.  More than

one source is responsible for the contamination in each of these areas to varying degrees.

Furthermore, there is a single plume of contaminated groundwater.  Although commingled

contamination is not synonymous with indivisible harm, *United States v. Alcan Aluminum Corp.,*

990 F.2d 711, 722 (2nd. Cir. 1993), it precludes apportionment based on distinct harms.

44.  I next consider whether there is a reasonable basis for determining the separate

contributions of Brown Group or the Plummer Defendants to the Solvent contamination at the

Property and offsite.  *Restatement (Second) of Torts,* § 433A.  CERCLA defendants seeking to

avoid joint and several liability bear the burden of proving that a reasonable basis for

apportionment exists.  *Id.*  This burden has been characterized as "substantial."  *United States v.*

*Alcan Aluminum Corp.,* 315 F.3d 179, 185 (2d Cir. 2003).  Furthermore, evidence supporting

divisibility must be concrete and specific.  *United States v. Alcan Aluminum Corp.,* 247 F.3d

706, 718 (8th Cir. 2001). The question of whether there is a reasonable basis for dividing

liability is a question of law while the actual apportionment of the harm is a question of fact.

*Matter of Bell Petroleum Serv., Inc.,* 3 F.3d 889, 898 (5th Cir. 1993); *United States v. Broderick*

*Inv. Co.,* 862 F. Supp. 272, 276 (D. Colo. 1994) (*citing Restatement (Second ) of Torts* §

434(1)(b); (2)(B) & cmt. d).

45.  Brown Group seeks to absolve itself from financial responsibility for the Solvent

contamination in the areas to the east of the Jail and offsite based on the nature of the

contamination found in these areas.  Indeed, based on distinguishing characteristics of the

Solvent contamination in these areas, I have found that La Plata caused the release of the

Solvents that are the primary source of contamination in the area to the east of the Jail and that

an unidentified third party or parties caused much of the offsite contamination.  Nonetheless,

Brown Group's manufacturing operations contributed to the contamination in each of these

areas.  In particular, Brown Group contributed to the contamination in the area to the east of the

Jail by abandoning the sediment trap containing Solvents from its manufacturing operations.

Brown Group also contributed to the contamination east of the Jail and offsite through the flow

of groundwater from the west of the Jail and underneath it.  The question therefore is whether

there is a reasonable basis to determine the separate contribution of Brown Group to

contamination in these areas.

46.  It has been recognized that determining the contribution of each cause to a single

harm where there has been a commingling of contaminants often requires a very complex

assessment of the relative toxicity, migratory potential, and synergistic capacity of the hazardous

wastes at issue.  *Bell Petroleum, supra,* 3 F.3d at 895 n. 7.  None of these issues was addressed in

a manner useful to apportionment analysis at trail.  Rather, Brown Group's evidence supporting

divisible harm based on geographic location focused on the relative measures of Solvents present

at different sites on the Property and offsite.  Furthermore, although the Solvent contamination to

the east of the Jail that is driving future costs of remediation, there was little to no evidence as to

how geographic distinctions impacted the recoverable response costs La Plata has already

incurred.  Under these circumstances, Brown Group has failed to meet its burden of establishing

that geographic location provides a reasonable basis for apportioning La Plata's past and future

response costs.

47.  Brown Group also asserts that a reasonable basis of apportionment exists between

Brown Group and the Plummer Defendants based on the period of time that each operated the Plant. The fact that the Plummer Defendants operated the Plant for approximately the same period of time using the same or similar processes as Brown Group, however, is an insufficient basis for concluding that it is responsible for approximately half of the Solvent contamination at the Property and offsite. The incomplete records presented at trial did not establish to any degree of reasonable probability the number of lenses manufactured or the volume of Solvents used and disposed of while the Plummer Defendants operated the Plant. *Compare Bell Petroleum, supra,* 3 F.3d at 903-4 (incomplete records did not preclude apportionment in light of other available evidence including witness testimony regarding practices and volume of activity by each defendant). Brown Group was also the Plummer Defendants' landlord during the time they operated the Plant and purchased the lens they manufactured, in part, through the use of Solvents. Under these circumstances, Brown Group has likewise failed to meet its burden of establishing that respective periods of operation provide a reasonable basis for apportioning La Plata's past and future response costs.

48. Because the Solvent contamination at the Property and offsite represents a single harm that cannot reasonably be apportioned among the various responsible parties, the liability of Brown Group and the Plummer Defendants for La Plata's recoverable response costs under CERCLA § 107(a) shall be joint and several but subject to Brown Group's claim for contribution under CERCLA § 113(f)(1). The specific amount of damages for which Brown Group is liable will be addressed in the remainder of this Order.

### 2. La Plata's CERCLA § 113(g)(2) Declaratory Judgment Claim

49. CERCLA § 113(g)(2) provides that in any cost recovery action under CERCLA §

107(a) the court "shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." Thus, La Plata is entitled to the entry of declaratory judgment on the issue of Brown Group's liability for its proportional share of future response costs that cannot be determined at this stage of La Plata's remedial action. Evidence was presented at trial, however, regarding some of the response costs that La Plata will incur in the future. Recovery of these future costs will be addressed in the remainder of this Order.

50. A declaratory judgment under CERCLA §113(g)(2) "determines *liability* for future response costs, not *recoverability* of those costs." *United States v. Hardage,* 982 F.2d 1436, 1445 (10th Cir. 1992). Accordingly, the entry of a declaratory judgment in La Plata's favor shall not preclude Brown Group from challenging La Plata's recovery of Brown Group's proportional share of future response costs not addressed herein on the basis of reasonableness, necessity, and consistency with the NCP. *Id.* at 1445-46. This Court retains jurisdiction to address the recoverability of future response costs should there be disputed issues that the parties are unable to resolve after diligent effort.

### 3. Brown Group's CERCLA § 113(f)(1) Contribution Counterclaim

51. Having concluded that joint and several liability is appropriate in this case, I proceed with consideration of Brown Group's claim for contribution under CERCLA § 113(f)(1). *See Bell Petroleum, supra,* 3 F.3d at 899 n. 10 (imposition of several liability in contrast to joint and several liability obviates need for CERCLA contribution phase). I first note that Brown Group did not assert a cross-claim for contribution against the Plummer Defendants. Given the nature of the relationship between Brown Group and the Plummer Defendants, equitable apportionment

would result in holding Brown Group responsible for the Plummer Defendant's "orphan share" in any event. *See Sun Co., Inc. (R&M) v. Browning-Ferris, Inc.,* 124 F.3d 1187, 1193 (10th Cir. 1997) (under CERCLA § 113(f), total cleanup costs - including responsibility for "orphan shares," *i.e.* shares attributable to PRPs who are either insolvent or cannot be located or identified, are equitably apportioned).   Thus, I consider only whether Brown Group is entitled to contribution from La Plata under CERCLA § 113(f)(1).

52.   CERCLA §113(f)(1) provides that "[a]ny person may seek contribution from any other person who is liable or *potentially liable* under [CERCLA § 107(a)]."  42 U.S.C. § 9613(f)(1) (emphasis added).  Thus, Brown Group need not prove all of the elements of a CERCLA § 107(a) claim against La Plata in order to prevail on its CERCLA § 113(f)(1) contribution claim.  *See also United States v. Atlantic Research Corp.,* 551 U.S. 128, 139 (2007) (distinguishing CERCLA § 113(f)(1) from CERCLA § 107(a) on the basis that a plaintiff is eligible to seek contribution under Section 113(f)(1) even if it has not incurred its own costs of response).  Rather, Brown Group need only prove that La Plata is a potentially responsible party ("PRP") under CERCLA § 107(a)(1) - (4) and that it would be inequitable to require it to pay the total amount of recoverable costs.  *See Id.* ("[A] PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties.").

53.   As set forth above, CERCLA § 107(a) identifies four categories of "covered persons," or PRPs, who are potentially liable thereunder including the current owner and operator of a facility where a hazardous substance is found and the owner and operator of a facility at the time a hazardous substance was disposed of there.  42 U.S.C. § 9607(a)(1) & (2). La Plata qualifies as a PRP under both CERCLA § 107(a)(1) & (2).

54.  La Plata qualifies as a PRP under CERCLA § 107(a)(1) based solely on its status as the current owner of the Property.  *See e.g. Morrison Enters., supra,* 302 F.3d at 1133 (interpreting the term "owner and operator " in the disjunctive in finding that the owner of the was a PRP under CERCLA § 107(a)(1)).  In addition though, La Plata is also the current operator of a facility from which hazardous substances have been released or threaten to be released.  Specifically, an "operator" under CERCLA is one who ""manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *United States v. Bestfoods*, 524 U.S. 51, 66–67 (1998).  As set forth above, La Plata conducted operations directly involving the disposal of hazardous waste when it directed Mr. Lucas to demolish the sediment tank containing Solvents from operations at the Plant.  La Plata likewise qualifies as a PRP under CERCLA § 107(a)(2) as the owner and operator of the Property at the time Mr. Lucas destroyed the sediment tank.

55.  Under CERCLA § 107(b)(3), a person who is otherwise a PRP under Section 107(a) can escape liability if that person:

> [C]an establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by ... an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions[.]

42 U.S.C. § 9607(b)(3).  To establish its innocent landowner defense, La Plata must therefore

prove by a preponderance of the evidence (1) that another party was the sole cause of the release

of hazardous substances and the damages caused thereby; (2) that the responsible party did not

cause the release in connection with a contractual, employment, or agency relationship with La

Plata; and (3) that it exercised due care and guarded against the foreseeable acts or omissions of

the responsible party.  *Id.  See also Westfarm Assocs. Ltd. P'shp. v. Wash. Suburban Sanitary

Comm'n*, 66 F.3d 669, 682 (4th Cir. 1995).

58. 56.  Under CERCLA, a "release" includes "any spilling, leaking, pumping, pouring,

emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the

environment ...."  42 U.S.C. § 9601(22).  The term "disposal" encompasses the subsequent

movement, dispersal, or release of hazardous substances already present at a site.  *Kaiser

Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1342-43 (9th Cir. 1992).

Under these broad definitions, the demolition of the sediment trap by Mr. Lucas, a subcontractor

working on La Plata's conversion of the Plant to the Jail, and the corresponding release of the

Solvents contained in the trap precludes La Plata's assertion of the innocent landowner defense

under CERCLA § 107(b)(3).

57.  Because La Plata is a PRP under CERCLA § 107(a)(1), I consider whether it would

be equitable to require Brown Group to pay all of La Plata's recoverable costs on its CERCLA §

107(a) claim.  *See Atlantic Research Corp., supra,* 551 U.S. at 139.  "[I] may allocate response

costs among responsible parties using such equitable factors as [I determine] are appropriate."

42 U.S.C. § 9613(f)(1).  I may consider "several factors, a few factors, or only one determining

factor ... depending on the totality of the circumstances presented."  *Bancamerica Commercial

Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 802, (10th Cir. 1996) (citations omitted).

58.  Among the factors courts typically consider in determining equitable allocation among PRPS are the so-called "Gore factors."  The Gore factors are:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

*United States v. Colo. & E. R.R. Co.,* 50 F.3d 1530, 1536 n. 5 (10th Cir. 1995).  The Gore Factors are neither an exhaustive nor exclusive list.  *Id.*  Consequently, courts have also considered many other factors including the relative fault of the parties and the parties' state of mind.  *Farmland Indus., Inc. v. Colo. & E. R.R. Co.,* 944 F. Supp. 1492, 1499 (D. Colo. 1996).

59.  Turning to the facts of this case, I have found that Brown Group's management and handling of Solvents during its operation of the Plant did not violate the applicable industry standards of care.  Nonetheless, the fact remains that Brown Group is responsible for initially introducing the Solvents contaminating the Property, including those released from the sediment tank, and that Brown Group profited from the sale of lens manufactured, in part, through the use of Solvents.  Furthermore, Brown Group has done little to assist with the investigation and remediation of the contamination and has instead devoted its resources to avoiding liability for the cost of these efforts.

60.  On the other hand, I have found that La Plata was unaware of potential

environmental issues at the time it purchased the Property and reasonably so.  Since becoming

aware of such issues, La Plata has worked diligently to determine the scope and nature of the

Solvent contamination and the necessary remediation at great expense.  La Plata has also

encouraged the State of Colorado's involvement with its efforts to remediate the contamination

and ensure a complete cleanup.  Nonetheless, La Plata's destruction of the sediment tank had a

significant impact on the Solvent contamination at the Property as evidenced by the unique

chemical fingerprint in the area to the east of the Jail.  This area is also driving the proposed

remediation of the Property.

61.  After balancing the equities, I conclude that Brown Group should bear responsibility

for the majority of La Plata's response costs but that a portion of these costs should be allocated

to La Plata.  Specifically, I allocate 75% of recoverable response costs to Brown Group and 25%

to La Plata.

### 4. Brown Group's Declaratory Judgment Counterclaim

62.  In the Final Pretrial Order, Brown Group noted that it was seeking a declaratory

judgment under CERCLA § 113(g)(2) "on liability for past, present, and future CERCLA

response costs."  *See* Doc. No, 247, p. 9.  Liability for La Plata's past response costs has been

fully resolved in the context of the CERCLA claims already addressed in this order.  I therefore

limit my analysis of Brown Group's declaratory judgment claim to liability for  La Plata's future

response costs.

63.  Having prevailed on its CERCLA § 113(f)(1) contribution claim, Brown Group is

entitled to a declaratory judgment under CERCLA § 113(g)(2) that its liability for future

recoverable response costs shall be limited to its allocable share of 75%.  *See United States v.*

*Davis,* 261 F.3d 1, 46-7 (1st Cir. 2001) (concluding that CERCLA § 113(g)(2) applies to CERCLA § 113(f)(1) contribution actions).  Again, however, entry of declaratory judgment to this effect shall not preclude Brown Group from challenging La Plata's recovery of future indeterminable response costs on the basis of reasonableness; necessity; and consistency with the NCP, and this Court retains jurisdiction to address such challenges that the parties are unable to resolve after diligent effort.

64.  While some of La Plata's future costs may be indeterminable, it is nonetheless appropriate to address future costs to the degree possible so to provide a benchmark for the parties going forward. As set forth in my findings of fact, the following future costs totaling $593,700 are recoverable:

a. $30,000 to implement and maintain institutional controls to address the soil contamination on the Property;

b. $486,100 for injection wells to address the groundwater contamination on the property; and

c. $77,600 for monitoring the injection wells.

65.  Brown Group is entitled to a declaratory judgment that it shall be liable for 75% of the recoverable future response costs set forth above and that it shall have no liability for the additional future costs identified by Mr. Rosasco because they are neither reasonable or necessary under existing circumstances.  In no event shall Brown Group bear any liability for the $285,000 La Plata seeks to rebuild the sallyport destroyed during the 2010 excavation because this cost is unrelated to remediation of the Solvent contamination and is the direct result of the unnecessary excavation.

### 5.  La Plata's CERCLA § 113(f)(1) Contribution Claim

66.  By its CERCLA § 113(f)(1) contribution claim, La Plata seeks to hold Brown Group liable for 100% of the costs of investigating and cleaning up the Solvent contamination.  For the reasons set forth in the analysis of Brown Group's CERCLA § 113(f)(1) contribution claim, I conclude that the appropriate allocation of liability for these costs is 75% to Brown Group and 25% to La Plata.

### III.  Order

For the reasons set forth above, IT IS HEREBY ORDERED that:

1.  Judgment shall enter in favor of Brown Group and against La Plata on La Plata's claim under RCRA § 6972(a)(1)(B);

2.  Judgment shall enter in favor of La Plata and against Brown Group on La Plata's cost recovery claim under CERCLA § 107(a), and Brown Group shall be jointly and severally liable for its proportional share of La Plata's past recoverable response costs which total $694,787;

3.  Judgment shall enter in favor of La Plata and against Brown Group on La Plata's declaratory judgment claim under CERCLA § 113(g)(2), and Brown Group shall be liable for its proportional share of La Plata's future recoverable response costs including its proportional share of La Plata's future recoverable response costs that are presently determinable in the total amount of $593,700;

4.  Judgment shall enter in favor of La Plata and against Brown Group on La Plata's contribution claim under CERCLA § 113(f)(1), and Brown Group shall be liable for 75% of  La Plata's past and future recoverable response costs;

5.  Judgment shall enter in favor of Brown Group and against La Plata on Brown Group's

contribution claim under CERCLA § 113(f)(1), and La Plata shall be liable for 25% of its past and future recoverable response costs;

6.   Judgment shall enter in favor of Brown Group and against La Plata on Brown Group's declaratory judgment claim under CERCLA § 113(g)(2) and the Declaratory Judgment Act, 28 U.S.C. § 2201, and Brown Group's liability for La Plata's future recoverable response costs shall be limited to its proportional share and, under existing circumstances, shall not include any of Mr. Rosasco's proposed future costs of remediation over and above the $593,700 in future response costs that I have concluded are recoverable;

7.   La Plata is awarded $521,090 in past recoverable response costs plus prejudgment and postjudgment interest;

8.   La Plata is awarded $445,275 in future recoverable response costs plus postjudgment interest;

9.   The Court retains jurisdiction to address the recoverability of further future response costs should there be disputed issues that the parties are unable to resolve after diligent effort; and

10.   La Plata has 30 days from the date of this Order to file a motion for reasonable attorney fees and other litigation expenses, as well as a calculation of prejudgment interest under CERCLA.

Dated: March   3   , 2011 in Denver, Colorado.

BY THE COURT:


   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE